| | | |
|---|---|---|
| TRADE LINKS, LLC, | ) | 3:19-CV-00308 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BI-QEM SA DE CV and BI-QEM, INC., | ) | |
| *Defendants*. | ) | MARCH 23, 2020 |

**MEMORANDUM OF DECISION**

Kari A. Dooley, United States District Judge

This case arises out of the breakdown in the two-decades-long business relationship between the plaintiff, Trade Links, LLC, ("Trade Links") and the defendants, BI-QEM SA de CV ("BI-QEM Mexico") and BI-QEM, Inc. ("BI-QEM Florence") (collectively, "BI-QEM"). Pending before the Court are BI-QEM's motions to dismiss (ECF Nos. 14, 56) and motions to strike (ECF Nos. 13, 55), which were filed together.[1] For the reasons set forth herein, the motions to dismiss are GRANTED in part and DENIED in part and the motions to strike are DENIED.

**Background**

**Factual Allegations**

***Formation of the Sales Representative Agreement***

Trade Links, a Connecticut limited liability company, is owned and operated by Elliot Essagof, a Connecticut resident. (Amended Compl. at ¶¶ 8–9, ECF No. 6; Mass. Essagof Aff. at ¶ 1, Ex. G to Amended Compl., ECF No. 6-7.)[2] Essagof has worked in the thermoset and plastics industry for decades, specializing in the areas of urea and melamine molding compounds. (Mass.

---

[1] The Court also has pending before it Trade Link's later-filed motion for leave to amend its complaint, which will be addressed in a separate decision.

[2] The affidavit Essagof submitted during related litigation in Massachusetts was attached to and incorporated into the Amended Complaint. (*See* Amended Compl. at ¶ 53 (incorporating affidavit into complaint).)

Essagof Aff. at ¶ 2.)  In September 1999, Essagof began speaking with Claudio Colombo regarding representation of his companies, which were located in only Mexico and Italy at the time.  (*Id.* at ¶ 4.)  Colombo's Mexican facility is owned by BI-QEM Mexico,[3] of which Colombo is the chief executive officer and owner.  (*Id.* at ¶ 11.)

On November 9, 1999, Trade Links and BI-QEM Mexico executed a sales representative agreement ("SRA"), which is the subject of the instant lawsuit.  (Amended Compl. at ¶ 3; *see also* SRA, Ex. A to Amended Compl., ECF No. 6-1.)  The SRA appoints Trade Links as the "sole and exclusive representative to develop business in, sell and promote" the covered products of BI-QEM Mexico and its affiliates in the United State, Puerto Rico, and Canada (the "Covered Territory").  (SRA at ¶ 2.)  The SRA prohibits Essagof or Trade Links from selling, distributing, or promoting competing products.  (*Id.* at ¶ 3(c).)  The first term of the SRA was for three years.  (*Id.* at ¶ 10.)  Thereafter, the SRA renews on an annual basis.  (*Id.*)  The term of the SRA automatically renews each year, however, so long as Trade Links exceeded the minimum sales requirement set forth in the SRA for the preceding twelve-month period and Trade Links is not in default in the performance of any of its obligations under the SRA.  (*Id.*)  Throughout the duration of the parties' relationship, Trade Links always exceeded the minimum sales requirement and was in full compliance with the SRA.  (Amended Compl. at ¶¶ 5, 29.)

The SRA contains three arbitration clauses, none of which apply here, that require the parties submit to binding arbitration in Stamford, Connecticut.  (SRA at ¶¶ 1(h), 1(i), 5(a).)  The SRA contains a choice-of-law provision, which states that the SRA "shall be construed, interpreted, and governed by the laws of the State of Connecticut."  (*Id.* at ¶ 24.)

---

[3] At the time, BI-QEM Mexico was known as Chemiplastica SA de CV.  To avoid confusion, the Court will use the current names of all entities involved in this dispute.

*Acquisition of the Florence Facility*

On December 13, 2007, Colombo contacted Essagof asking for assistance with on-going negotiations with a competitor, Raytor Holdings AB ("Raytor"), concerning the purchase of Raytor's facility in Florence, Massachusetts. (Mass. Essagof Aff. at ¶ 18.) Essagof assisted Colombo by preparing a variety of marketing, pricing, and financial reports regarding the potential acquisition. (*Id.*) After Colombo and Essagof's meeting with Raytor's chief executive officer in June of 2008, Colombo directed Essagof to implement a pricing strategy and to initiate moving production and sales from the BI-QEM companies to the Florence facility, which was still owned by Raytor. (*Id.* at ¶ 19.) In or about October 2008, BI-QEM officially acquired Raytor's Florence facility and formed what was later known as BI-QEM, Inc. (*Id.* at ¶¶ 23, 27.) BI-QEM Florence is incorporated in Delaware with a principle place of business in Florence, Massachusetts. (*Id.* at ¶ 11.) Colombo is the chief executive officer of BI-QEM Florence, and some of the officers or managers for BI-QEM Mexico also work for BI-QEM Florence. (*Id.* at ¶ 32.)

Before and after the acquisition of the Florence facility, Colombo and Essagof had numerous discussions concerning Trade Links' and Essagof's role with the new business entity. (*Id.* at ¶¶ 23, 29.) Colombo assured Essagof that he would be the exclusive sales agent for the new Florence facility and that the SRA would continue to govern their business relationship. (*Id.* at ¶¶ 23–24, 28–30.) Once BI-QEM Florence was formed, the SRA did in fact govern Trade Links' relationship with BI-QEM Florence, as exemplified by the fact that BI-QEM Florence issued sales commissions to Essagof on a monthly basis at the commission rates established by the SRA. (*Id.* at ¶¶ 28–29, 31.)

### *Breakdown of BI-QEM–Trade Links Relationship*

In October of 2017, Colombo asked Essagof to join BI-QEM as an in-house sales executive, effectively at a significantly lower compensation rate, and agree to terminate the SRA. (Amended Compl. at ¶ 15.iii.)  When Essagof refused, Colombo began marginalizing Essagof and Trade Links in the business and threatening to withhold commissions from Trade Links.  (*Id.* at ¶¶ 15.iv., 22–23.)  In April 2018, BI-QEM requested that Essagof coordinate a "meet and greet" tour between key customers and the chief operating officer and sales manager of BI-QEM.  (*Id.* at ¶ 23.)  The meetings were aimed at taking over Trade Links' accounts.  (*Id.*)  Around this time, BI-QEM further authorized Adrian Kerr to act as its sales representative in the Covered Territory and held a meet and greet for Kerr and customers.  (Ex. C to Amended Compl. at 2, ECF No. 6-3.) Essagof objected to this, but BI-QEM did not respond.  (*Id*. at 3)

On May 25, 2018, Essagof wrote to Colombo to open a dialogue about modifying the SRA so that they could continue to meet their mutual goals.  (Amended Compl. at ¶ 24.)  On May 31, 2018, Colombo notified Essagof that BI-QEM did not intended to renew the SRA upon the expiration of the current term on December 31, 2018 (the "notice of termination").  (Notice of Termination at 1, Ex. B to Amended Compl., ECF No. 6-2.)  At that point, Colombo asserted, "that the sales representative relationship between all BI-QEM group companies and Trade Links, LLC will end."  (*Id.*)  Colombo acknowledged that the SRA states that it will automatically renew if Trade Links meets the minimum sales requirement for the term and is not otherwise in default. (*Id*.; *cf.* SRA at ¶ 10.)  But Colombo contended that this provision was no longer in force because BI-QEM and Trade Links had not set a minimum sales requirement in years.  (Notice of Termination at 1.)

Trade Links disputed BI-QEM's authority to terminate the SRA because it had always exceeded the minimum sales requirement agreed upon by the parties. (Amended Compl. at ¶ 29.) Trade Links repeatedly protested BI-QEM's increasing efforts to marginalize Essagof and Trade Links in the business. (*Id.* at ¶¶ 31, 33, 34.) On July 18, 2018, Essagof was summoned to the Florence facility where BI-QEM's director of special projects, Enrico Calegari, explained to Essagof that the notice of termination "was only a 'negotiating tactic' meaning to soften him [Essagof] and therefore submit to Mr. Colombo's request." (*Id.* at ¶ 35.) Calegari cautioned that Essagof should be wary of Colombo's financial ability to litigate this matter if he continued to resist. (*Id.*) That same day, Trade Links filed a demand for arbitration with the American Arbitration Association ("AAA") in order to address BI-QEM's interference with Trade Links' rights under the SRA. (*Id.* at ¶¶ 37, 39.)

Both BI-QEM entities attempted to secure a stay of the arbitration. On August 8, 2018, BI-QEM Mexico filed a petition to stay the arbitration in New York state court ("New York stay action"). (*Id.* at ¶ 42.) On August 14, 2018, BI-QEM Florence filed a similar petition in Massachusetts state court, arguing that the SRA did not apply to it ("Massachusetts stay action"). (*Id.* at ¶ 52.) BI-QEM was unsuccessful in securing a stay in either forum. (*Id.* at ¶¶ 47–48, 54.) The AAA panel similarly rejected BI-QEM's efforts to stay the arbitration and held hearings in October of 2018. (*Id.* at ¶¶ 49–50, 61, 73.) Colombo and representatives for BI-QEM Florence did not attend the arbitration hearings. (*Id.* at ¶¶ 61–62, 74.) On October 30, 2018, the day after Essagof testified before the arbitration panel, BI-QEM sent a letter withdrawing the notice of termination (the "withdrawal letter"). (*Id.* at ¶¶ 76–77.) Thereafter, the parties reached a resolution whereby the arbitration and stay actions were dismissed. (*Id.* at ¶¶ 92–94.)

On January 7 and 9, 2019, Essagof met with Colombo in Switzerland to discuss the future of the SRA and their business relationship. (*Id.* at ¶¶ 98, 114.) Colombo presented Essagof with a proposed operations manual, which placed strict micro-management on the activities of Trade Links. (*Id.* at ¶ 99.) Essagof rejected this proposal and did not enter into any new agreements with BI-QEM. (*Id.* at ¶¶ 102, 120.) During this meeting, Essagof also inquired about the outstanding commissions owed to Trade Links. (*Id.* at ¶ 110.) Colombo threatened that in order to avoid paying those commissions he would "'[s]hut down Mexico and Florence,'" "'file chapter 11 so that you get nothing,'" or "liquidate and reincorporate under a new legal entity so that Trade Links no longer 'has a contract with anyone.'" (*Id.* at ¶ 113.)

In the months that followed, BI-QEM continued to instruct customers to place orders directly with it and withhold sales and order information from Trade Links. (*Id.* at ¶¶ 121–25, 129–30.) Colombo also continued to refuse to pay Trade Links' commissions. (*Id.* at ¶¶ 126–28.) On March 14, 2019, Trade Links terminated the SRA based on BI-QEM's total breach of the agreement. (*Id.* at ¶ 131; *see also* Ex. L to the Amended Compl., ECF No. 6-12.)

**Procedural History**

On March 3, 2019, Trade Links instituted the present action. On March 25, 2019, after terminating the SRA, Trade Links filed its amended complaint, which is the operative complaint. (ECF No. 6.) The Amended Complaint asserts eight causes of action for: (1) breach of contract, (2) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.*, (3) violation of the Connecticut franchise act, Conn. Gen. Stat. § 42-133e, *et seq.*, ("franchise act") (4) breach of the covenant of good faith and fair dealing, (5) interference with business expectancy, (6) violation of the Connecticut sales representatives commissions statute, Conn. Gen. Stat. § 42-481, *et seq.*, ("commissions statute"), (7) violation of the Massachusetts

Unfair Trade Practices Act, Mass. Gen. Laws. ch. 93A, § 1, *et seq*., ("Chapter 93A"), and (8) vexatious litigation in violation of Conn. Gen. Stat. § 52-568. All of the causes of action arise out of the SRA and its termination.

**Motions to Dismiss**

Both BI-QEM entities move to dismiss the Amended Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. They also move to dismiss the Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6). BI-QEM Florence challenges the sufficiency of the pleadings as to each count, while BI-QEM Mexico challenges only Counts Two through Eight.

### Rule 12(b)(2)—Personal Jurisdiction

When a defendant challenges the court's personal jurisdiction under Rule 12(b)(2), the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam). Because neither party sought to conduct discovery or hold an evidentiary hearing, Trade Links need make only a *prima facie* showing of jurisdiction through its own pleadings and supporting affidavits. *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). These pleadings and affidavits must be construed in a light most favorable to the plaintiff, with all doubts resolved in the plaintiff's favor. *Id.*

There are two types of personal jurisdiction: general and specific. Trade Links contends only that the Court has specific personal jurisdiction over both BI-QEM entities. To determine whether specific personal jurisdiction exists in a diversity case, such as this, the court conducts a two-part analysis, "looking first to the state's long-arm statute and then analyzing whether

jurisdiction comports with federal due process." *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 37 (2d Cir. 2001).

### Connecticut's Long-Arm Statute

Connecticut's long-arm statutes sets forth four situations in which foreign corporations can be hailed into a Connecticut court. Conn. Gen. Stat. § 33-929(f). As relevant here, Section 33-929(f)(1) of the long-arm statute states that a foreign corporation is subject to suit in Connecticut "on any cause of action arising . . . [o]ut of any contract . . . to be performed in this state." Trade Links argues that the Court has personal jurisdiction over BI-QEM pursuant to Section 33-929(f)(1) because its claims arise out of the SRA, which is a contract "to be performed" in Connecticut.[4] BI-QEM disagrees and asserts that because Trade Links' obligations under the SRA spanned the entire United States, Puerto Rico, and Canada it cannot constitute a contract to be performed in Connecticut specifically. Additionally, BI-QEM Florence argues that it cannot be subjected to personal jurisdiction in Connecticut based on the SRA because it is not a party to or otherwise bound by the SRA.

### The SRA Is a Contract to Be Performed in Connecticut

The Connecticut Supreme Court recently clarified that the phrase "to be performed" in Connecticut's long-arm statute "refers to the performance that the parties contemplated in the contract, without regard to whether it has actually been performed." *Samelko v. Kingstone Ins. Co.*, 329 Conn. 249, 258 (2018) (footnote omitted). "In addition, because the plain language of

---

[4] Trade Links also asserts that personal jurisdiction may be exercised over BI-QEM under the tort clause of the long-arm statute, Conn. Gen. Stat. § 33-929(f)(4). All of Trade Links claims, however, arise out of the SRA. *See Arise*, Black's Law Dictionary (11th ed. 2019) ("1. To originate; to stem (from) . . . 2. To result (from)" . . . .); *Hogle v. Hogle*, 167 Conn. 572, 577 (1975) (holding that automobile exclusion in insurance policy that excluded coverage for any accidents or injuries that "arise out of" use of an automobile applied to any accident or injury that "'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to' the use of the automobile"). Because the Court concludes that it has personal jurisdiction over BI-QEM and the claims asserted in the Amended Complaint pursuant to Section 33-929(f)(1), the Court need not decide the applicability of Section 33-929(f)(4).

the [long-arm] statute does not specify which party's performance must be considered, it makes no difference . . . [which] party to the contract was required to perform in this state." *Id.* at 259. "Whether the contract contemplates performance in Connecticut turns on the totality of contacts which [a party to the contract] obligates itself to have, or contemplates that it will have, in this forum on the basis of the agreed upon performance in the contract. This requires a fact specific, case-by-case examination of the obligations that the contract contemplates. The outer boundaries of what qualifies as a contemplated performance are broad. In fact, . . . the contemplation of *incidental* acts of performance of contracts in [Connecticut] [can] come within [the long-arm] statute when the defendant also has other significant contacts with this forum." *Id.* at 260–61.

This is not a close call. The SRA contemplated that performance would occur in Connecticut. The SRA requires Trade Links to develop business in, sell, and promote BI-QEM's products in the Covered Territory and to provide regular reports to BI-QEM regarding the covered products, the state of the market, and sales. It also commanded that Trade Links obligations under the SRA would "be performed initially by Eliot [Essagof] and no other Person whatsoever." (SRA at 3.(j).) The SRA specifically identifies Trade Links as a Connecticut limited liability company with a principal place of business in Westport, Connecticut. It similarly identifies Essagof as a resident of Westport, Connecticut. Finally, the SRA contains a list of BI-QEM's existing customers in the Covered Territory, and two of the six identified customers are located in Connecticut. Given that Trade Links, Essagof and a third of BI-QEM's customers were identified as being located in Connecticut, it is clear that the SRA contemplated that performance would occur in Connecticut.[5] The presence of a Connecticut choice-of-law provision in the SRA

---

[5] Indeed, while not always the case, it is a reasonable expectation that when an entity engaged in a particular business undertakes certain contractual obligations, that business will meet and perform those obligations, at least in part, from its place of business.

reinforces the conclusion that the parties expected Connecticut to have a substantial connection to the SRA. *Fleming v. ISCO Indus., Inc.*, No. 3:17-cv-00648 (VAB), 2018 WL 1141358, at \*7 (D. Conn. Mar. 2, 2018) ("A choice of law provision, while not the sole factor in the Court's personal jurisdiction analysis, does indicate where the parties intended that the contract be performed."), *aff'd*, 750 Fed. Appx. 62 (2d Cir. 2019) (summary order); *Johnsen, Fretty & Co., LLC v. Lands S., LLC*, 526 F. Supp. 2d 307, 311–312 (D. Conn. 2007) (finding that Connecticut choice of law provision in contract indicated that the parties contemplated "that the contract would be performed in Connecticut"); *cf. Planned Furniture Promotions, Inc. v. City Antique, Inc.*, No. 3:14-cv-00279 (MPS), 2014 WL 5481438, at \*4 (D. Conn. Oct. 29, 2014) (determining that the court lacked personal jurisdiction over the defendant where, among other factors, it was "undisputed that the [contract] contains an Oregon choice of law provision").

BI-QEM nonetheless argues that the long-arm statute is not satisfied because the SRA does not expressly contemplate or require performance in Connecticut, and further that Trade Links performed only administrative tasks ancillary to the SRA in Connecticut. Courts in this District have held that a plaintiff can assert personal jurisdiction based solely on the plaintiff's performance under a contract only if "(1) the contract expressly contemplated or required performance in Connecticut; or (2) the plaintiff had actually performed its obligations in Connecticut and such performance was the most substantial part of the obligations to be performed under the contract." *Planned Furniture Promotions, Inc.*, 2014 WL 5481438, at \*3 (citation omitted; internal quotation marks omitted). Even if this is the applicable standard,[6] the Court disagrees with BI-QEM.

---

[6] The Court questions the continuing viability of this standard in light of the Connecticut Supreme Court's discussion and analysis in *Samelko*. The Court does not resolve the possible tension between this standard and *Samelko*, however, because neither party has briefed this issue and whether this standard remains good law does not change the outcome of this decision.

As discussed above, the SRA clearly contemplates that performance will occur in large measure in Connecticut. It is a contract that involves Connecticut-based customers, gives a Connecticut business the exclusive right to act as BI-QEM and its affiliates sales agent in the Covered Territory, and is governed by Connecticut law. Moreover, Essagof's declarations, submitted in opposition to the motions to dismiss, establish that Trade Links performed its obligations under the SRA in Connecticut. Essagof attests that he spent 70 percent of his time performing his obligations under the SRA, *i.e.*, tending to "client needs, orders and potential new client leads," from Trade Links' office in Connecticut. (Second Essagof Decl. at ¶ 6.) Essagof further attests that one of BI-QEM Florence's Connecticut clients makes up 30 percent of its sales turnover, and another of BI-QEM Mexico's Connecticut clients generates approximately $1.2 million in annual sales. (First Essagof Decl. at ¶¶ 6–7.)

In response, BI-QEM summarily asserts Trade Links could not have performed a substantial part of its obligations under the SRA from Connecticut given the size of the Covered Territory and the requirement that Trade Links attend out-of-state trade shows and meetings. The Court has no reason to question Essagof's representation that he spent 70 percent of his time servicing existing clients and developing new clients while in Connecticut, and BI-QEM's conjecture to the contrary does not undermine Trade Links' proof. *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) ("If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." [citation omitted; internal quotation marks omitted]), *as amended* (May 25, 1993).

For these reasons, Trade Links has met its burden of establishing that the Court's exercise of personal jurisdiction over BI-QEM is proper under Connecticut's long-arm statute.

**Trade Links Has Adequately Alleged that the SRA Can Be Enforced Against BI-QEM Florence**

BI-QEM Florence separately asserts, in the alternative, that personal jurisdiction over it cannot be predicated on claims arising out of the SRA insofar as the SRA cannot be enforced against it because (1) it is not an affiliate of BI-QEM Mexico and (2) it was acquired after the SRA was executed. Trade Links disagrees, contending that BI-QEM Florence qualifies as an affiliate and further is precluded from arguing that it is not bound by the SRA based on the parties' course of dealings. Notwithstanding Trade Links' apparent willingness to litigate this issue, this argument goes to the merits of the underlying claims and is not appropriately decided on a motion to dismiss. The only question for the Court at this stage of proceedings is whether Trade Links has made a *prima facie* showing that personal jurisdiction exists, and the Amended Complaint, the exhibits attached thereto, and Essagof's declarations submitted in opposition to the motions to dismiss are replete with factual allegations that, if accepted as true, would render the SRA enforceable against BI-QEM Florence.

By way of example only, Essagof attests that Colombo repeatedly assured him before and after the acquisition of the Florence facility that the SRA would apply to the new BI-QEM entity. (Mass. Essagof Aff. at ¶¶ 24, 28–31; First Essagof Decl. at ¶¶ 12, 16, 23.) Essagof further represents that the SRA has, in fact, always governed Trade Links business relationship with BI-QEM Florence. (Mass. Essagof Aff. at ¶¶ 28, 31; First Essagof Decl. at ¶¶ 15–16; *see also* Amended Compl. at ¶¶ 15.ii., 55–56.) Finally, Essagof asserts that the reason the parties did not execute a new agreement was because "Mr. Colombo advised that for 'tax reasons' he needed the agreement to be under just the name of the Mexican entity." (Mass. Aff. at ¶ 9; First Essagof Decl.

at ¶ 18; *see also id.* at ¶ 13.)  These facts, and others not specifically cited, when accepted as true are sufficient to make out a *prima facie* case that the SRA can be enforced against BI-QEM Florence and, therefore, that personal jurisdiction exists under Section 33-929(f)(1).[7]

### Due Process

Having concluded that Connecticut's long-arm statute is satisfied, the Court must next consider whether its exercise of personal jurisdiction over BI-QEM comports with due process.[8]

"Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."  *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  "The due process analysis proceeds in two steps.  First, courts evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test.  Where the claim arises out of, or relates to, the defendant's contacts with the forum—*i.e.*, specific jurisdiction is asserted— minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into

---

[7] The Amended Complaint and declarations similarly make the requisite showing that BI-QEM Florence is an affiliate of BI-QEM Mexico within the meaning of the SRA.  While the parties shall undoubtedly continue to litigate the merits of these assertions, for purposes of the jurisdictional analysis, Trade Links has met its threshold burden.

[8] Only BI-QEM Florence offers any analysis on the question of whether the Court's exercise of personal jurisdiction over it comports with due process.  BI-QEM Mexico did purport to incorporate by reference all of BI-QEM Florence's arguments, but the existence of personal jurisdiction must be determined on an individualized basis. *TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06-cv-013447 (CM), 2008 WL 650385, at *12 (S.D.N.Y. Mar. 7, 2008) (noting that personal jurisdiction "requires an individual analysis of each defendant").  BI-QEM Florence's argument, therefore, has no application to BI-QEM Mexico.  Accordingly, this issue is deemed abandoned by BI-QEM Mexico. *Lami v. Stahl*, No. 05-cv-01416 (MRK), 2007 WL 3124834, at *1 (D. Conn. Oct. 25, 2007) ("It is well settled that a failure to brief an issue is grounds to deem the claim abandoned."); *see Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."); *see also Burchette v. Abercrombie & Fitch Stores, Inc.*, No. 08-cv-08786 (RMB)(THK), 2009 WL 10699568, at *2 (S.D.N.Y. Sept. 16, 2009) ("The Court 'is not required to scour [a] party's various submissions to piece together appropriate arguments.'" [citation omitted]).  The Court reiterates its earlier observation, however, that the question of whether personal jurisdiction exists over BI-QEM Mexico is not a close call, as a matter of state or federal law.

court there. Second, once minimum contacts are established, a court considers those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (citations omitted; internal quotation marks omitted).

A commercial actor need not have a physical presence in a state to establish the necessary minimum contacts so long as the defendant's own actions have created a "substantial connection" with the forum state—for example, by deliberately engaging in significant activities within the forum state or creating continuing obligations between himself and a resident of the forum state. *Burger King Corp.*, 471 U.S. at 475–76. Under such circumstances, the defendant "manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 476 (internal quotation marks omitted).

Here, BI-QEM Florence has purposefully availed itself of the benefit of doing business in Connecticut in a variety of ways. First, BI-QEM Florence has had clients in Connecticut throughout the duration of the parties' business relationship, which spanned a decade. (First Essagof Decl. at ¶¶ 6–8.) Second, BI-QEM Florence, used a Connecticut company as the exclusive sales representative for its products in the Covered Territory, thereby further creating continuing obligations between itself and a resident of Connecticut. Employees, managers, officers, and other agents of BI-QEM Florence have also visited Trade Links' offices in Connecticut to discuss their business under the SRA. (*Id.* at ¶ 5.) Lastly, BI-QEM Florence, through the SRA, enjoys the benefits and protections of Connecticut law by virtue of the Connecticut choice-of-law provision in the SRA. (SRA at ¶ 24.) Although such a provision standing alone is insufficient to confer

personal jurisdiction, it reinforces BI-QEM Florence's deliberate affiliation with Connecticut. *Burger King Corp.*, 471 U.S. at 482. The choice-of-law provision and the three arbitration clauses, which require arbitration in Connecticut, also make it reasonably foreseeable that BI-QEM Florence will be haled into court in Connecticut. For these reasons, the Court is persuaded that BI-QEM Florence has sufficient minimum contacts with Connecticut to satisfy the requirements of due process.

The Court is also persuaded that its exercise of personal jurisdiction over BI-QEM Florence would not offend traditional notions of fair play and substantial justice. The burden at this stage of the analysis is on the defendant to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (quoting *Burger King*, 471 U.S. at 477). "The Supreme Court has held that the court must evaluate the following factors as part of this 'reasonableness' analysis: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins. Co.*, 84 F.3d at 568.

These factors weigh in favor of the exercise of personal jurisdiction under the circumstances presented. First, Connecticut is a neighboring state of Massachusetts, where BI-QEM Florence is located. Modern transportation and communication methods have made it is far less burdensome for defendants in general to defend themselves in foreign states. *Burger King Corp.*, 471 U.S. at 474; *Estate of Metzermacher v. Nat'l R.R. Passenger Corp.*, 570 F. Supp. 2d 292, 300–01 (D. Conn. 2008). And given the international reach of the BI-QEM organization, the

presence of multiple clients in Connecticut and BI-QEM Florence's willingness to accept an agreement that mandated arbitration of certain issues in Connecticut, the Court is not persuaded that litigating in Connecticut will be unduly burdensome. Second, Connecticut has a strong interest in adjudicating this case. States generally have a "manifest interest" in providing effective means of redress to their residents. *Burger King Corp.*, 471 U.S. at 473; *McGee*, 355 U.S. at 223–24. In addition, Connecticut law governs the SRA. The third factor similarly favors litigating in Connecticut, as Connecticut will be the most convenient forum for Trade Links. The fourth and fifth factors appear neutral. Witnesses are likely located in Connecticut, Massachusetts, and abroad. *See Robertson-Ceco Corp.*, 84 F.3d at 574 ("In evaluating th[e] [fourth] factor, courts generally consider where witnesses and evidence are likely to be located."). And BI-QEM Florence has not identified any significant or substantive social policies implicated by this suit. Accordingly, the Court is not persuaded that exercising personal jurisdiction over BI-QEM Florence would be unreasonable and, therefore, the motions to dismiss for lack of personal jurisdiction are denied.

### Rule 12(b)(6)—Failure to State a Claim

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause

of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

BI-QEM has moved to dismiss each of Trade Links' claims for failure to state a claim for which relief can be granted. Trade Links contends that each of its claims is adequately pleaded.

### Count One—Breach of Contract

BI-QEM Florence moves to dismiss Count One on the grounds that it has no contractual relationship with Trade Links. Again, this argument goes to the merits of this claim, and, as previously explained, Trade Links has adequately alleged that the SRA can be enforced against BI-QEM Florence. Accordingly, BI-QEM Florence's motion to dismiss Count One is denied.

### Count Two—CUTPA Violation

To successfully state a claim for a CUTPA violation, a plaintiff must allege that the he (1) suffered an ascertainable loss of money or property (2) that was caused by an unfair method of competition or an unfair or deceptive act (3) that occurred in the conduct of trade or commerce. *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 789–90 (2019). BI-QEM challenges only whether the first and second elements have been adequately pleaded.

"The ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief. . . . An 'ascertainable loss' is a loss that is capable of being discovered, observed or established. The term 'loss' necessarily encompasses a broader meaning than the term 'damage,' and has been held synonymous with deprivation, detriment and injury. To establish an ascertainable loss, a plaintiff is not required to prove actual damages of a specific dollar amount. A loss is ascertainable if it is

measurable even though the precise amount of the loss is not known." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217–18 (2008) (alterations omitted; citations omitted; internal quotation marks omitted).

The ascertainable loss, of course, must have been caused by a prohibited act. Conn. Gen. Stat. § 42-110g(a). The Connecticut Supreme Court has adopted the so-called "cigarette rule" promulgated by the Federal Trade Commission for determining when a practice is unfair. *Cenatiempo*, 333 Conn. at 790. Under this rule, courts must consider:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers competitors or other businesspersons.

*Id.* (alterations omitted; citation omitted; internal quotation marks omitted). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." *Id.* (citation omitted; footnote omitted; internal quotation marks omitted).

Here, Trade Links has pleaded a plausible CUTPA violation. The Amended Complaint outlines in detail how BI-QEM sought to marginalize Trade Links from their business arrangement in an effort to coerce Trade Links into renegotiating or terminating the SRA. BI-QEM is alleged to have issued a notice of termination to bolster its negotiating position with Trade Links and with full knowledge that such termination was not permitted under the SRA. When Trade Links attempted to arbitrate this dispute, BI-QEM filed petitions to stay in both New York and

Massachusetts and is accused of knowingly submitting false affidavits in support of the Massachusetts stay action. Only after the arbitration proceeded to hearing did BI-QEM withdraw the notice of termination. Rather than attempt to repair its relationship with Trade Links, however, BI-QEM is alleged to have increased its efforts to marginalize Trade Links. Employees, directors, and officers for BI-QEM continued to direct customers to deal only with BI-QEM, removed Trade Links from e-mail correspondence with customers, and withheld information concerning client orders from Trade Links. During the course of this dispute, BI-QEM is further alleged to have withheld commissions that are due and owing. Indeed, Colombo is accused of having told Essagof that he would do whatever he could to avoid paying these commissions, including by filing for bankruptcy or liquidating and reincorporating his businesses. He is also accused of having repeatedly used Essagof's age as a basis for terminating the SRA.

Not surprisingly, BI-QEM has made no meaningful effort to explain how this conduct, if accepted as true, does not state a plausible CUTPA violation. The conduct BI-QEM is accused of having engaged in is precisely the type of unscrupulous behavior that CUTPA was designed to prevent. Trade Links has further alleged throughout the Amended Complaint that BI-QEM is withholding commissions due under the SRA and hindered Trade Links efforts to serve as BI-QEM's sales representative, thereby depriving Trade Links of additional commissions. These unpaid and lost commissions are plainly "a loss that is capable of being discovered, observed or established." *Artie's Auto Body, Inc.*, 287 Conn. at 218 (citation omitted; internal quotation marks omitted). BI-QEM's claim in this regard is, frankly, specious.

The motions to dismiss as to Count Two are denied.

*Count Three—Connecticut Franchise Act*

BI-QEM argues that Trade Links cannot seek relief under the franchise act because the SRA appoints Trade Links as a sales representative, not a franchisee.[9] Trade Links responds it qualifies as a franchisee because it was in the business of selling goods and BI-QEM exerted control over the manner in which goods were sold.

The franchise act empowers franchisees to sue for damages or injunctive relief for violations of the substantive provision of the act. A "franchisee" is "a person to whom a franchise is granted," while a "franchisor" is "a person who grants a franchise to another person." Conn. Gen. Stat. § 42-133e(c)–(d). A "franchise" is, in relevant part, "[a] written agreement . . . in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods . . . under a marketing plan or system prescribed in substantial part by a franchisor . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate. . . ." Conn. Gen. Stat. § 42-133e(b). "The definition requires a two-step inquiry. First, the franchisee must have the right to offer, sell or distribute goods or services. Second, the franchisor must substantially prescribe a marketing plan for the offering, selling or distributing of goods or services." *Getty Petroleum Mktg., Inc. v. Ahmad*, 253 Conn. 806, 813 (2000) (citation omitted; internal quotation marks omitted).

"[T]he question of whether one is engaged in the business of offering or selling [goods] can best be analyzed by measuring how far the [plaintiff] is from the situation of a pure employee,

_____

[9] BI-QEM further argues that Trade Links cannot assert a claim under the franchise act because Trade Links terminated the SRA. This argument goes to the merits of the underlying claim and would require the Court to resolve a factual dispute between the parties.

who merely takes money and hands it over to his employer. To be a franchise, the franchisee must be engaged in the business of offering or selling [goods]." *Id.* at 814–15 (alterations omitted; citation omitted; internal quotation marks omitted). "[I]t is the independent function of the parties in a marketing arrangement that controls whether the parties have created a franchise." *Id.* at 815. If there is not "substantial market risk" to the plaintiff or a "substantial indicia of entrepreneurial responsibility," then the plaintiff is not a franchisee. *Id.* at 815, 819 (citation omitted; internal quotation marks omitted). This is because "the purpose of the general franchise act . . . is to protect independent business persons who have assumed an entrepreneurial role and who face the risk of the market." *Id.* at 819. Accordingly, "one who acts as an agent for another in selling a product" does not ordinarily qualify as a franchisee. *Id.* at 820; *e.g.*, *id.* at 816–19 (holding leasees of gas stations were not franchisees because they merely facilitated the petroleum company's sale of its own gasoline and petroleum products in exchange for commissions); *Garbinski v. Nationwide Prop. & Cas. Ins. Co.*, 523 Fed. Appx. 24, 27 (2d Cir. 2013) (summary order) (holding commissioned insurance agent did not qualify as franchisee); *Rudel Mach. Co. v. Giddings & Lewis, Inc.*, No. 3:97-cv-01115 (RNC), 2001 WL 36210782, at *2 (D. Conn. July 25, 2001) (holding independent sales representative for manufacturer did not qualify as franchisee because "[b]eing involved in the process of promoting another's products simply is not the same as having been granted the right to engage in the business of selling them").

Even construing the allegations liberally and in the plaintiff's favor, Trade Links has not plausibly alleged that its relationship with BI-QEM was one of franchisor-franchisee. Indeed, the provisions of the SRA belie any such claim. Trade Links was not in the business of offering and selling goods, within the meaning of the franchise act. Trade Links did not purchase BI-QEM's products and resell them to consumers. *E.g.*, *Garbinski*, 523 Fed. Appx. at 27 (affirming district

court holding that insurance agent was not a franchisee, in part, because he did not buy insurance products from defendant-insurer before reselling them to clients); *cf. Edmands v. CUNO, Inc.*, 277 Conn. 425, 428, 444 (2006) (noting that franchisee in addition to acting as sales representative for franchisor distributed products directly to customers at prices franchisee set). Instead, Trade Links acted "as an agent for another in selling a product." *Getty Petroleum Mktg., Inc.*, 253 Conn. at 820. Any orders Trade Links received had to be forwarded to BI-QEM, which had the sole discretion to accept and fulfill the orders. *Cf. Rudel Mach. Co.*, 2001 WL 36210782, at *2 (rejecting argument plaintiff qualified as franchisee where "the undisputed facts show that it engaged in the business of providing services as an independent sales representative to defendant . . . and that it had no authority to make binding offers or sales contracts on behalf of defendant"). BI-QEM had the exclusive right to set the price and terms for the sale of its products, and Trade Links was paid commissions for its sales on a monthly basis according to pre-determined rates. Although Trade Links was responsible for promoting the sale of BI-QEM's products and attending trade shows, BI-QEM had to approve Trade Links marketing, advertising, and training materials. BI-QEM also bore the cost of Trade Links attendance at trade shows. Trade Links was permitted to develop new business opportunities, but it could do so with only the prior written consent of BI-QEM. Finally, BI-QEM was required to defend and indemnify Trade Links from any liability relating to BI-QEM's intellectual property and products.

The motions to dismiss as to Count Three is GRANTED.

### Count Four—Breach of the Covenant of Good Faith and Fair Dealing

BI-QEM Florence moves to dismiss Count Four on the grounds that it is not a party to the SRA and, therefore, had no duty of good faith and fair dealing. The Court has already determined

that Trade Links has plausibly alleged that BI-QEM Florence is bound by the SRA and, therefore, its motion to dismiss as to Count Four is denied.

BI-QEM Mexico moves to dismiss Count Four on the grounds that it is duplicative of Count One. "[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract." *Rafalko v. Univ. of New Haven*, 129 Conn. App. 44, 51 (2011) (citation omitted; internal quotation marks omitted). Trade Links alleges in Count Four that BI-QEM violated the implied covenant of good faith in four ways: (1) by impeding its rights under the SRA, (2) by sending the notice of termination in bad faith, (3) by pressuring Trade Links to stop the arbitration, and (4) by withdrawing the notice of termination to avoid an arbitration decision that was favorable to Trade Links. Although the first two claims are also asserted in Count One, the latter two are not. Because Count Four is not identical or essentially identical to Count One, it is not sufficiently duplicative so as to be subject to dismissal. *Cf. Arch Ins. Co. v. Centerplan Constr. Co., LLC*, No. 3:16-cv-01891 (VLB), 2018 WL 6519063, at *16 (D. Conn. Dec. 11, 2018) (dismissing counterclaim for breach of covenant of good faith where the allegations were "essentially identical to those relied upon for [the] breach of contract counterclaim"). BI-QEM Mexico's motion to dismiss Count Four is denied.

### Count Five—Tortious Interference with Business Expectancy

BI-QEM next argues that Trade Links cannot assert a claim for tortious interference with business expectancy based on its relationship with BI-QEM's customers. Trade Links disagrees.

"[I]n order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that: (1) a business relationship existed between the plaintiff and another party; (2) the defendant intentionally interfered with the business relationship while

knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 32–33 (2000).

BI-QEM's sole argument is that Trade Links business relationship with BI-QEM's customers cannot satisfy the first element—*i.e.*, a business relationship between the plaintiff and a third party—as a matter of law. The only authority BI-QEM cites in support of this proposition is *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir. 1979), a case that has no bearing on the issue presented. In *Fuchs Sugars & Syrups*, the issue on appeal was whether there was sufficient evidence to support the jury's finding that Amstar, a sugar distributor, conspired to restrain trade in violation of Section 1 of the Sherman Act when it changed its distribution system and eliminated the use of its general brokers. *Id.* at 1028. When providing background on the relationship between the plaintiff-general brokers and Amstar, the Second Circuit, in a passing reference, characterized the sugar purchasers as "Amstar's customers."[10] *Id.* at 1028–29. Whether the general brokers had a business or otherwise cognizable relationship with the sugar purchasers was not an issue on appeal, and the Second Circuit never commented, in *dicta* or otherwise, on whether a sales representative can assert a claim for tortious interference under Connecticut law based on its relationship with its principal's customers. The motion to dismiss Count Five, therefore, is denied.

### Count Six—Connecticut Commissions Statute

Connecticut's commissions statute permits sales representative to sue to recover outstanding commissions after "a contract between a principal and a sales representative is terminated." Conn. Gen. Stat. § 42-482(a). In Count Six, Trade Links contends that BI-QEM

---

[10] Elsewhere in its decision, the Second Circuit referred to the end-sugar purchasers as the brokers' customers. *E.g.*, *id.* at 1029 n.2 ("The brokers were not timid about using this information for the benefit of their customers.").

wrongfully terminated the SRA on May 31, 2018 when it issued the notice of termination and that it has wrongfully withheld commissions that are due and owing.

BI-QEM contends that Count Six fails to state a claim, as pleaded, because the notice of termination was withdrawn prior to its effective date. Again, this argument goes not to the adequacy of the pleading, but to the merits of the claim. The commissions statute defines "termination" as "the end of the business relationship between a sales representative and a principal, whether by the principal or the sales representative. . . ." Conn. Gen. Stat. § 42-481(5). Trade Links has plausibly alleged that its business relationship with BI-QEM ended on May 31, 2018. Although BI-QEM purported to withdraw the notice of termination prior to its effective date, Trade Links has plausibly alleged "[f]or all practical purposes the Withdrawal Letter was really not a withdrawal" because BI-QEM continued to marginalize Trade Links from the business and to refuse to pay commissions after the letter was sent. (Amended Compl. at ¶ 209.) That allegation is sufficient to state a plausible claim for relief.

Accordingly, the motions to dismiss Count Six are denied.

### Count Seven—Chapter 93A Claim

BI-QEM contends that Trade Links claim under Chapter 93A fails because they are not competitors and Trade Links has not alleged that the alleged unfair trade acts substantially and primarily occurred in Massachusetts.[11] Trade Links responds that they do not need to be competitors for it to be able to assert a claim under Chapter 93A and that it has adequately pleaded that the unfair trade acts at issue occurred substantially and primarily in Massachusetts.

---

[11] BI-QEM also argues that Chapter 93A does not apply because the choice-of-law provision in the SRA dictates that Connecticut law applies to any disputes regarding the SRA. The Court disagrees. The choice-of-law provision applies only to the construction and interpretation of the SRA.

Chapter 93A closely parallels CUTPA. To state a cause of action under Chapter 93A, a plaintiff must allege that the he (1) suffered a loss of money or property (2) as a result of an unfair method of competition or an unfair or deceptive act (3) that was used or employed by someone who engages in trade or commerce. Mass. Gen. Laws. ch. 93A, § 11. The plaintiff must also establish that "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within [Massachusetts]." *Id.*

BI-QEM first asserts that only competitors can assert claims under Chapter 93A. This argument lacks support in the plain language of Chapter 93A and Massachusetts precedent interpreting that statute. "It is well established that a practice or act is unfair under [Chapter 93A], if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors *or other business people*." *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244, 259 (Mass. 2008) (emphasis added; internal quotation marks omitted); *see also Giuffrida v. High Country Inv'r, Inc.*, 897 N.E.2d 82, 95 (Mass. App. 2008) (noting that Chapter 93A requires only that "the parties are engaged in more than a minor or insignificant business relationship" [internal quotation marks omitted]).

The next issue is whether Trade Links has adequately alleged that BI-QEM's unfair acts occurred principally or substantially in Massachusetts. "Whether the 'actions and transactions [constituting the Chapter 93A claim] occurred primarily and substantially within the commonwealth' is not a determination that can be reduced to any precise formula. Significant factors that can be identified for one case may be nonexistent in another." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 798 (Mass. 2003) (footnote omitted). The

ultimate question is "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within [Massachusetts]." *Id.* at 799. "On the one hand, a single instance of misconduct in one jurisdiction may have greater significance for a case as a whole than a multiplicity of instances of misconduct in another jurisdiction. On the other hand, the sheer number of instances of misconduct in one jurisdiction may produce the heft needed to resolve the question." *Id.* at 798–99. Unless it is clear on the face of the complaint that this element cannot be satisfied, the issue should not be decided on a motion to dismiss. *See Resolute Mgmt. Inc. v. Transatlantic Reinsurance Co.*, 29 N.E.3d 197, 201 (Mass. App. 2015) ("In light of the multiple factors to be applied, and the nuanced and flexible approach to assessing them . . . we find it difficult to imagine how . . . [a center of gravity] assessment might be made on the basis of the allegations of the complaint alone. . . ."); *Berklee Coll. of Music, Inc. v. Music Indus. Educators, Inc.*, 733 F. Supp. 2d 204, 213 (D. Mass. 2010) (concluding that "absent some extraordinary pleading concession by a claimant" the question of whether the wrongful conduct "primarily and substantially" occurred in Massachusetts cannot be resolved at the motion to dismiss stage); *see also The Hertz Corp. v. Enter. Rent-A-Car Co.*, 557 F. Supp. 2d 185, 197 (D. Mass. 2008) ("The defendants have not cited, nor has the court located in its research, any case in which a Chapter 93A claim was dismissed for a failure to allege that anticompetitive effects were felt predominantly in Massachusetts.").

Here, the allegations in the Amended Complaint include a number of events and conduct on the part of BI-QEM which are alleged to have occurred, expressly or by implication, in Massachusetts. By way of example only, BI-QEM Florence is accused of improperly prosecuting a petition to stay Trade Link's arbitration in Massachusetts and to have submitted false affidavits in support of that petition. Trade Links was then required to litigate that action in Massachusetts.

This conduct is alleged to have all been in furtherance of the scheme of both BI-QEM entities to get out from under the SRA. As indicated, a motion to dismiss is not the vehicle by which to conduct the necessary fact intensive inquiry on this issue. The Amended Complaint sufficiently pleads a Chapter 93A claim.

Accordingly, the motions to dismiss Count Seven are denied.

### Count Eight—Statutory Vexatious Litigation

BI-QEM argues that Trade Links cannot assert a claim for vexatious litigation based on the stay actions because those actions did not terminate in Trade Links' favor and each party agreed to bear their own costs. BI-QEM Mexico further contends that Conn. Gen. Stat. § 52-568 cannot be invoked because its stay action was filed in New York, not Connecticut. Trade Links responds that it has adequately pleaded the elements of vexatious litigation. Trade Links also contends that because the stay actions were filed to prevent an arbitration in Connecticut, Section 52-568 does apply. The Court agrees that a claim under Section 52-568 cannot be based on a suit commenced and prosecuted outside of Connecticut and, therefore, Count Eight fails to state a claim upon which relief can be granted.

Section 52-568 does not contain an express jurisdictional limitation. In *Shaeffer v. O.K. Tool Co.*, 110 Conn. 528 (1930), however, the Connecticut Supreme Court considered whether Connecticut law applied to a common law claim for vexatious litigation arising out of an action brought in New York. The Connecticut Supreme Court concluded that New York law applied to the action. *Id.* at 333. The court reasoned: "Since the tort, if any, was committed in the state of New York, the existence of the cause of action, as well as the measure of damages, is to be determined by the law of that state." *Id.* Relying on *Shaeffer*, at least one court in this District has concluded that a claim for relief under Section 52-568 must be based on a cause of action or

complaint commenced and prosecuted in Connecticut. *Hydro Air of Conn., Inc. v. Versa Techs., Inc.*, 99 F.R.D. 111, 112 (D. Conn. 1983) (disallowing counterclaim under Section 52-568 where underlying suit was brought in New Jersey); *see also Gilbert v. Zivtech, LLC*, No. CV17-6074279-S, 2018 WL 3715572, at *7–*8 (Conn. Super. Ct. July 5, 2018) (concluding based on *Shaeffer* that vexatious litigation claim arising out of lawsuit filed in Pennsylvania did not satisfy the tort-prong of Connecticut's long-arm statute because "the alleged tort took place, if at all, in Pennsylvania").

"It is axiomatic that the legislature is presumed to be aware of the common law when it enacts statutes." *Pac. Ins. Co., Ltd. v. Champion Steel, LLC*, 323 Conn. 254, 265 (2016). Moreover, the Connecticut Supreme Court has instructed that "[n]o statute is to be construed as altering the common law, farther than its words import [and a statute] is not to be construed as making any innovation upon the common law which it does not fairly express. . . . [Courts] recognize only those alterations of the common law that are clearly expressed in the language of the statute because the traditional principles of justice upon which the common law is founded should be perpetuated." *Burns v. Adler*, 325 Conn. 14, 67 (2017) (citations omitted; internal quotation marks omitted). Section 52-568 does not expressly abrogate the common law principle articulated in *Shaeffer*. Accordingly, Section 52-568 contains the same jurisdictional limitation as existed at common law and claims brought thereunder must be predicated on a civil action that was brought and prosecuted in Connecticut. Because the underlying civil actions in this case were brought and prosecuted in Massachusetts and New York, Trade Links has failed to state a claim under Section 52-568.

Count Eight is dismissed with prejudice.[12]  *See Danis v. Moody's Corp.*, 627 Fed. Appx. 31, 32 (2d Cir. 2016) (summary order) (affirming dismissal with prejudice of complaint against defendant due to futility); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it.  Repleading would thus be futile.  Such a futile request to replead should be denied.").

**Motion to Strike**

Simultaneous with their motions to dismiss, BI-QEM filed motions to strike Paragraphs 84 through 91 of the Amended Complaint "upon the ground that these allegations are based upon a confidential and privileged e-mail which [Trade Link's] counsel acknowledged was sent to him in error and would be deleted when he received it on October 11, 2018."  (BI-QEM Florence Mot. at 1; BI-QEM Mexico Mot. at 1.)  Trade Links responds that the October 11, 2018 e-mail was not privileged and that the information in Paragraphs 84 through 91 relate to the identity of a disbarred attorney who is serving as a consultant for BI-QEM (known as "BI-QEM Miami Attorney 3").  And because the identity of a party's attorney is not privileged, the material in Paragraphs 84 through 91 should not be stricken.

The following additional facts are relevant to this motion.  On October 11, 2018, counsel for Trade Links received an e-mail from an unknown sender, referred to as BI-QEM Miami

---

[12] Although BI-QEM Mexico is the only defendant to have advanced this argument, the Court concludes that it is appropriate to dismiss Count Eight as to all defendants because no relief can be provided to Trade Links under Section 52-568 based on the Massachusetts stay action.  *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 580 (S.D.N.Y. 2002) ("a district court may dismiss claims *sua sponte* for failure to state a claim, at least so long as the plaintiff had notice and an opportunity to be heard on the issue"), *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004); *Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund v. Canny*, 876 F. Supp. 14, 17 (N.D.N.Y. 1995) (dismissing complaint against moving and non-moving defendants "because all of the defendants are similarly situated and moreover, because the plaintiff had ample notice and opportunity to oppose the instant motion to dismiss"); Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1357 (3d ed.) ("Even if a party does not make a formal motion under Rule 12(b)(6), the district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair to the parties.").

Attorney 3 in the Amended Complaint. The e-mail was part of an e-mail chain between Trade Links' counsel, BI-QEM's counsel, Colombo, and an administrator for the AAA. Upon reviewing the e-mail, plaintiff's counsel realized that it was likely intended for defense counsel only. Therefore, plaintiff's counsel responded to the e-mail, indicating that he did not believe the communication was intended for him and that he and his colleagues would delete it. Because plaintiff's counsel did not recognize BI-QEM Miami Attorney 3's e-mail address, he conducted an internet search to find out who had sent the e-mail. The search revealed that BI-QEM Miami Attorney 3 was a disbarred attorney from Florida who had been federally prosecuted. Paragraphs 84 through 91 of the Amended Complaint contain allegations regarding BI-QEM Miami Attorney 3, his involvement in the arbitration, and a discussion between Essagof and Colombo about BI-QEM Miami Attorney 3.

Rule 12(f) grants the court the discretion to strike from any pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *Tucker v. Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1, 15 (D. Conn. 2013) ("Whether to grant or deny a motion to strike is vested in the trial court's sound discretion."). "Motions to strike under Rule 12(f) are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Walczak v. Pratt & Whitney*, No. 3:18-cv-00563 (VAB), 2019 WL 145526, at *2 (D. Conn. Jan. 9, 2019) (citation omitted; internal quotation marks omitted); *Gierlinger v. Town of Brant*, No. 13-cv-00370 (AM), 2015 WL 3441125, at *1 (W.D.N.Y. May 28, 2015) ("[B]ecause striking a [part] of a pleading is a drastic remedy . . . motions under Rule 12(f) are viewed with disfavor by the federal courts and are infrequently granted.").

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of

obtaining or providing legal advice. The privilege's underlying purpose has long been to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. In order to balance this protection of confidentiality with the competing value of public disclosure, however, courts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable. The party asserting the privilege . . . bears the burden of establishing its essential elements." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (alterations omitted; citations omitted; internal quotation marks omitted).

BI-QEM has not established that Paragraphs 84 through 91 contain privileged information or communications. These paragraphs do not reveal or rely upon the substance of any communications between BI-QEM Miami Attorney 3, BI-QEM's counsel, and Colombo. They only contain allegations about BI-QEM Miami Attorney 3, his involvement in the arbitration, and discussions between Essagof and Colombo about this attorney. None of these matters are protected by the attorney-client privilege. Further, the identity of BI-QEM Miami Attorney 3, whether acting as counsel or a consultant to counsel, is not itself privileged. *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, No. 08-cv-09117 (GBD)(HBP), 2010 WL 11594991, at *16 (S.D.N.Y. Oct. 14, 2010) ("Counsel's identity is not privileged"); *see Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06-cv-06198 (LAK)(JCF), 2007 WL 1521117, at *11 (S.D.N.Y. May 24, 2007) ("'absent special circumstances,' the identity of an attorney's client is not privileged"); *see also In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 247–48 (2d Cir. 1986) ("While consultation with an attorney, and payment of a fee, may be necessary to obtain legal advice, their disclosure does not inhibit the ordinary communication necessary for an attorney to act effectively, justly, and expeditiously. For this reason, absent special circumstances not present here, disclosure of fee

information and client identity is not privileged even though it might incriminate the client."). And in any event, BI-QEM Miami Attorney 3's identity is not disclosed in the Amended Complaint.

Accordingly, the motions to strike are denied.[13]

**Conclusion**

For the reasons set forth herein, the motions to dismiss [ECF Nos. 14, 56] are GRANTED in part and DENIED in part. The motions to dismiss are GRANTED with prejudice as to Counts Three and Eight. The motions to dismiss are DENIED in all other respects. The motions to strike [ECF Nos. 13, 55] are DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of March 2020.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[13] The issue properly presented in the motion to strike is whether the Amended Complaint contains privileged information or communications. As discussed herein, it does not. Both parties however assert various ancillary claims and appear to seek alternative relief based upon BI-QEM's association with BI-QEM Miami Attorney 3 or Trade Links' use of the October 11, 2018 e-mail. With respect to Trade Link's submission, it is not for this Court to dictate who BI-QEM associates with or consults in connection with this litigation. Nor is it for this Court to investigate or conduct any oversight with respect to those persons. As to BI-QEM's submissions, the Court does not evaluate the conduct of counsel in deciding whether allegations should be stricken from a complaint. Nor does the Court render credibility determinations as to counsel's representations through a motion to strike. And the Court does not decide herein the extent to which the October 11, 2018 e-mail can be referenced or otherwise relied upon by Trade Links in this litigation. Finally, the Court does not decide the issue of whether Paragraphs 84 through 91 might be stricken for reasons not advanced or whether proof of these allegations should be permitted at trial.