UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRADE LINKS, LLC, <br> *Plaintiff*, | ) <br> ) <br> ) | 3:19-CV-00308 (KAD) |
| v. | ) <br> ) | |
| BI-QEM SA DE CV and BI-QEM, INC., <br> *Defendants*. | ) <br> ) <br> ) | SEPTEMBER 28, 2021 |

**MEMORANDUM OF DECISION**
**RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ECF NO. 165**

Kari A. Dooley, United States District Judge:

This case arises out of the breakdown in the two-decades-long contractual business relationship between the plaintiff, Trade Links, LLC, ("Trade Links," or "Plaintiff") and the defendants, BI-QEM SA de CV and BI-QEM, Inc. (collectively, "BI-QEM," or "Defendants"). Pending before the Court is BI-QEM's motion for summary judgment, which Trade Links opposes. For the reasons set forth below, the motion for summary judgment is DENIED.

**Legal Standard**

The standard under which courts review motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry being conducted by the court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words,

there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is

confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Factual Background**[1]

Each party has a decidedly different view of the facts and circumstances which gave rise to this litigation, as demonstrated by their respective Local Rule 56(a)(1) and 56(a)(2) Statements. Local Rule 56(a) Statements are intended to narrow a case's scope by identifying which facts the parties do not contest and to focus the Court on disputes, if any, that can be resolved without a trial. The submissions in this case, however, provide little assistance in this regard. Of BI-QEM's seventy-five (75) statements of material fact in its 56(a)(1) Statement, Trade Links disputes twenty-three (23). Trade Links then adds forty-two (42) material facts to its 56(a)(2) Statement. What is manifest is that the parties do not agree as to the how and why regarding the end of their business relationship and the attendant impact on Trade Links' claims.

Though little more than a chronology of events or an acknowledgement as to the content of various documents, the parties do not dispute the following. Trade Links, LLC and Chemiplastica, BI-QEM SA de CV's predecessor, had a relationship governed by a Sales Representative Agreement, dated November 9, 1999 and which is otherwise referred to as the "SRA." (Plf.'s L.R. 56(a)(2) Statement at 1, ECF No. 182.[2]) At the time that the SRA[3] was signed, BI-QEM, Inc. did not exist, and BI-QEM, Inc. only came into existence in 2008. (Plf.'s L.R. 56(a)(2) Statement at 10.)

---

[1] Following the telephonic status conference on November 25, 2020, the Court granted, *nunc pro tunc*, Trade Links' motion for extension of time to submit its opposition papers to BI-QEM's motion for summary judgment. *See* Order, ECF No. 190. Consequently, the Court considered Trade Links' November 16, 2020 submissions in deciding this motion.
[2] All citations to Trade Links' Local Rule 56(a)(2) Statement are to page numbers.
[3] The SRA was included as Exhibit A to the Second Amended Complaint, ECF No. 125-1.

The SRA had an initial term of three years, SRA ¶ 1(*o*), and the contract made Trade Links the "'sole and exclusive' sales representative to sell Defendants' products" while prohibiting Trade links from competing with Defendants during the contract's term. (Plf.'s L.R. 56(a)(2) Statement at 3.) After the initial three-year period, the SRA automatically renewed each additional year as long as Trade Links met the minimum sales requirement for the previous twelve months. (Plf.'s L.R. 56(a)(2) Statement at 2–3.) The SRA contains a clause stating that "Any failure to reach an agreement concerning Minimum Sales Requirements, or adjustments thereto, shall be submitted to binding arbitration." (Plf.'s L.R. 56(a)(2) Statement at 9; *see also* SRA ¶ 1(i).) The parties, however, did not discuss setting the minimum sales after 2002. (Plf.'s L.R. 56(a)(2) Statement at 3.)

Nevertheless, the parties' relationship continued.[4] Then, on May 31, 2018, BI-QEM sent a letter to Trade Links, advising that the SRA would terminate on December 31, 2018. (Plf.'s L.R. 56(a)(2) Statement at 18.) Trade Links eventually responded by filing a demand for arbitration with the American Arbitration Association on July 18, 2018. (Plf.'s L.R. 56(a)(2) Statement at 20.) On October 30, 2018, BI-QEM withdrew its May 31 termination letter. (Plf.'s L.R. 56(a)(2) Statement at 18.) Trade Links withdrew the arbitration demand prior to the arbitration panel rendering a decision. (*See* Plf.'s L.R. 56(a)(2) Statement at 21.)

Following the end of that arbitration process, on March 14, 2019, Trade Links formally terminated the SRA. (Plf.'s L.R. 56(a)(2) Statement at 3–4.) As noted, additional facts will be set forth as necessary.

---

[4] Trade Links makes numerous allegations concerning how the relationship progressed and how it ultimately ended. These allegations, which are disputed, lie at the core of the Plaintiff's claims and the Court will include them in the decision as needed. A fuller description of Trade Links' allegations can be found in the Court's Memorandum of Decision at ECF No. 103.

**Discussion**

This case is going to trial. The Defendants' motion for summary judgment is a compendium of fourteen arguments, which largely assail Trade Links' ability to prove damages as a means of defeating Trade Links' case on a piecemeal basis. Each argument implicates obvious factual disputes supported by competing evidence. Indeed, the motion for summary judgment reads like a closing argument premised on BI-QEM's sometimes myopic view of the evidence. It is also an attempt to control the narrative of the Plaintiff's case. But the Defendants do not get to re-cast the Plaintiff's claims, and then argue that the claims, as re-cast, are fatally flawed as a matter of law. Given the Court's conclusion that each legal argument fails because each would require the court to resolve factual disputes, the Court does not fully analyze the arguments and only attempts to identify material facts in dispute with respect to each.[5]

*Lost Future Commissions as Speculative.*

BI-QEM argues that it is entitled to summary judgment on Trade Links' breach of contract claim because Trade Links "has not proven to a certainty that it sustained damages under the SRA in the form of 'lost future commissions.'" (Defs' Mem. 2, ECF No. 165-24.) Specifically, BI-QEM asserts that because the annual renewal of the parties' contract was subject to various conditions, any damages resulting from a breach which are premised on the contract being renewed are too speculative. *See Anderson Group, LLC v. City of Saratoga,* 805 F.3d 34, 52–53 (2d Cir. 2015). But a plaintiff may recover future losses as long as such recovery is limited to a reasonable time and is supported by the evidence, particularly in a breach of contract case like this one. *See Beverly Hills Concepts, Inc., v. Schatz and Schatz, Ribicoff and Kotkin*, 247 Conn. 48, 76–77, 717 A.2d

---

[5] In so doing, the Court does not intend to limit the issues to be tried or attempt to identify all material facts for which there is competing evidence.

724 (1998). In this vein, Trade Links has offered evidence, to include its expert's report and information about its course of dealing with its customers and BI-QEM, that indicate that its relationship with BI-QEM may have lasted into the future for some period of time. (*See* McHugh Decl., Exs. 1–4, 14, 29, ECF No. 184.) Whether Trade Links is able to demonstrate that it is entitled to future earnings for fifteen years, fifteen days, or not at all is a factual question for the jury.

*Lost Future Commissions as Contractually Prohibited.*

BI-QEM next argues that Trade Links "cannot seek 'lost future commissions' under the SRA due to its post-termination competition" with BI-QEM. This "heads I win, tails you lose" argument presupposes several factual predicates which must be decided by the jury, to include a determination of when and how the SRA was terminated. BI-QEM asserts, on the one hand, that if the SRA was terminated by Trade Links on March 14, 2019, then Trade Links could not collect on any commissions that might have accrued after that date because paragraph 11(c) of the SRA would preclude such recovery. But if, on the other hand, the SRA is still in effect and Trade Links could thereby be eligible to collect the commissions at issue, then Trade Links' current competition with BI-QEM would bar Trade Links' recovery pursuant to paragraph 3(c) of the SRA. BI-QEM also argues that Trade Links, as agent for BI-QEM, owes BI-QEM an additional ongoing duty not to compete with BI-QEM. Trade Links disagrees with BI-QEM's reading of the relevant portions of the SRA, which of itself creates a disputed material fact, and argues that no agency relationship existed, in part by pointing to other portions of the SRA.

First, the existence of an agency relationship is a fact intensive inquiry, *see, e.g.*, *Wesley v. Schaller Subaru, Inc.*, 277 Conn. 526, 543, 893 A.2d 389 (2008), which cannot be resolved on this record. But more to the point, BI-QEM's argument simply ignores Trade Links' contention—supported by deposition testimony, letters, and other documents—that BI-QEM breached the SRA

6

by, among other things, attempting to terminate the contract without cause and attempting to encroach on Trade Links' exclusive sales territory. (*See* McHugh Decl., Exs. 7–16, 22, 31.) And if BI-QEM is found to have breached the SRA, then Trade Links is entitled to its provable damages, to include Trade Links' expectancy under the SRA. *See, e.g.*, *O'Brien v. O'Brien*, 326 Conn. 81, 111 n.10, 161 A.3d 1236 (2017) (quoting *West Haven Sound Dev. Corp. v. West Haven*, 201 Conn. 305 319–20, 514 A.2d 734 (1986)). The who, how, and when of this breach of contract dispute is also a fact-intensive inquiry, *see Land Group Inc. v. Palmieri*, 123 Conn. App. 84, 92, 1 A.3d 234 (Conn. App. Ct. 2010), and also cannot be decided on this record.

*Pre-Termination Commissions as Paid or Unrecoverable.*

BI-QEM argues that it has "paid all commissions due under the SRA prior to [Trade Links'] termination of the SRA." This argument has two components: (1) BI-QEM has paid all of the commissions for orders placed prior to Trade Links' March 14, 2019 Termination Letter,[6] and (2) Trade Links cannot recover on any orders received after March 14, 2019 from customers Leviton and Eaton because the relevant sales agreements with Leviton and Eaton do not include a requirement that either entity purchase specific amounts of product. However, Trade Links argues that the Leviton and Eaton agreements obligated the customers to purchase some quantity of product each year and supports those arguments through both course of dealing evidence and language within the contracts themselves. (*See* McHugh Decl., Exs. 2–4, 14.) It is for a jury to decide whether the agreements would result in additional commissions being owed to Trade Links and whether those commissions are therefore recoverable as damages.

---

[6] The Court observes that Trade Links disputed this contention when this motion for summary judgment was originally filed. (*See* Plf.'s L R. 56(a)(2) Statement at 4–5; McHugh Decl. Ex. 30.) Because this issue is not dispositive, the Court need not determine whether there remains on an issue of material fact on this point.

*Lost Future Commissions after December 31, 2019.*

BI-QEM argues that Trade Links is not entitled to any commissions allegedly accruing after December 31, 2019 because no minimum sales requirement was set for 2019. This argument is perhaps a more detailed version of BI-QEM's argument that Trade Links has not proven to a certainty that it has suffered damages for lost future commissions which the Court rejected above. In this version of the argument, the SRA does not renew unless Trade Links met the minimum sales requirement for the previous year, and because no minimum sales requirement was set for 2019, the SRA could not have been renewed beyond December 31, 2019. This argument fails for reasons similar to those articulated above, but the Court also observes that Trade Links has offered course of conduct evidence tending to show that the minimum sales requirement had not been set or reset since the SRA was originally signed twenty years ago and that the minimum sales requirement remains at twenty-four percent of the relevant market. (*See* McHugh Decl, Ex. 5.) Consequently, the parties' course of conduct creates a genuine dispute as to whether setting or resetting a minimum sales requirement was, as a matter of practice, an ongoing predicate for the SRA's renewal.

*Whether BI-QEM, Inc. is Bound by the SRA.*

BI-QEM argues that BI-QEM, Inc. is not a party to the SRA because it never signed the SRA and it only came into existence as a corporate entity in 2008, nine years after the SRA was executed. Trade Links, however, has submitted multiple pieces of evidence that could indicate that BI-QEM, Inc. was bound to the SRA by the doctrines of adoption or equitable estoppel. (*See* Plf.'s L.R. 56(a)(2) Statement at 23–24; McHugh Decl. Exs. 24–25.) Consequently, there is a genuine dispute as to whether BI-QEM, Inc. is bound by the SRA.

*Whether Discovery Issues Preclude Plaintiff from Proving Damages.*

BI-QEM also argues that Trade Links is precluded from seeking damages which were not quantified in its initial disclosures, and, consequently, Trade Links cannot make its case on Counts Two through Eight of the Second Amended Complaint. For Counts Seven and Eight, BI-QEM also argues that these specific causes of action were added in the Second Amended Complaint and so could in no way be reflected in the unsupplemented initial disclosures. Trade Links responds that any such failure was substantially justified or otherwise harmless. In advancing these arguments, BI-QEM seeks a discovery sanction pursuant to Fed. R. Civ. P. 37. Rule 37(c)(1) provides that if a party fails provide or supplement information as required by Rules 26(a) and (e), the party is not allowed to use that information "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The rule also provides for a range of other sanctions, and before imposing preclusion, a harsh remedy, the court should inquire more fully into actual difficulties that at violation causes and consider less drastic response. *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156–57 (S.D.N.Y. 2012). The Court declines to take up an undeveloped motion for sanctions in this context,[7] especially where the sanction sought is the most severe available to the Court and it

---

[7] Of the cases cited by BI-QEM, only one took up the issue of preclusion within a motion for summary judgement, and, in that case, the nonmoving party essentially conceded that it had not performed a damage calculation at all. *Compare Gould Paper Corp. v. Madisen Corp*, 614 F. Supp. 2d 485, 490–91 (S.D.N.Y. 2009) (precluding damages calculation but denying motion for summary judgment on the relevant claim because the nonmoving party could still claim nominal damages) *with Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630 (2005) (separate motion to preclude following partial summary judgment) *affirmed* 469 F.3d 284 (2d Cir. 2006); *Zuppardi's Appizza, Inc. v. Tony Zuppardi's Appiza, LLC*, No. 3:10-CV-1363(RNC), 2012 WL 13034190 (D. Conn. Mar. 30, 2012) (separate motion to preclude); *Salvemini v. Target Stores, Inc.*, No. 3:08CV402 (HBF), 2012 WL 1118062 (D. Conn. Apr. 3, 2012) (separate motions *in limine*); *Mass Probiotics, Inc. v. Aseptic Technology LLC*, No. SA CV 16-1394-DOC (GJSx), 2017 WL 10621233 (C.D. Cal. Dec. 21, 2017) (separate motion to strike and exclude); *Montilla v. Walmart Stores, Inc.*, No. 2:13–cv–2348–GMN–VCF, 2015 WL 5458781 (D. Nev. Sept. 16, 2015) (separate motion to exclude damages); *Endurance Am. Specialty Ins. Co. v. Lance-Kashian & Co.*, No. CV F 10–1284 LJO DLB, 2011 WL 4375264 (E.D. Cal. Sept. 19, 2011) (separate motion to exclude damages theory); *Roberts v. Ground Handling, Inc.*, No. 04 Civ. 4955(WCC), 2007 WL 2753862 (S.D.N.Y. Sept. 20, 2007) (separate motion to exclude following denial of motion for summary judgment); *KW Plaistics v. U.S. Can Co.*, 131 F. Supp. 2d 1289 (M.D. Ala. 2001) (separate motion *in limine*).

is not readily apparent that the Defendants have suffered any significant prejudice.[8] Nevertheless, BI-QEM is free to file a motion *in limine* in advance of trial seeking to curtail the introduction of certain evidence related to Trade Links' damages claim based upon alleged violations of the rules of discovery.

*Connecticut Unfair Trade Practice Act ("CUTPA").*

BI-QEM argues that Trade Links "has not proven a CUTPA violation." BI-QEM asserts that its relationship with Trade Links does not fall within CUTPA's definition of "trade or commerce"[9] and that this action is nothing more than a breach of contract claim. (Defs.' Mem. 27.) "The same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation . . . [but] not every contractual breach rises to the level of a CUTPA violation." *New England Wood Pellet, LLC v. New England Pellet, LLC*, No. 3:09cv01777 (MPS), 2014 WL 12750658, at *15 (D. Conn. Aug. 6, 2014). As this Court previously observed, the "conduct BI-QEM is accused of having engaged in is precisely the type of unscrupulous behavior that CUTPA was designed to prevent." (Mem. Decision 19, ECF No. 103.) Trade Links has now cited to evidence in the record to support these allegations. (*See* McHugh Decl., Exs. 8–13, 31.) If proven, these allegations provide the aggravating circumstances necessary to satisfy CUTPA even where the claim arises in the context of a breach of contract. *See Lester v. Resort Camplands Intern., Inc.*, 27 Conn. App. 59, 70–72, 605 A.2d 550 (Conn. App. Ct. 1992) (affirming CUTPA violation where the means by which the defendants breached the contract with the plaintiffs involved intentional

---

[8] The parties had ample opportunity to explore the strengths and weaknesses of each other's case, including the damages at issue. Indeed, BI-QEM not only had timely access to Trade Links' expert report, but BI-QEM also had sufficient opportunity to provide that report to its own expert for analysis.

[9] Specifically, BI-QEM states, in conclusory fashion, that a relationship between a sales agent and a manufacturer does not fall within CUTPA's definition of "trade or commerce," and, in support of this assertion, BI-QEM cites cases which have held that an employer-employee relationship falls outside the scope of CUTPA. BI-QEM also cites cases which have held that this logic can extend to those who are technically independent contractors. As discussed *infra*, Trade Links was not under the control of, or even exclusively engaged by BI-QEM, rendering these cases, in the Court's view, inapposite.

unfair and deceptive acts); *Tyson Roller Bearing, Inc. v. Accuride Corp.*, No. X03CV065009721S, 2008 WL 2168916, at *2 (Conn. Super. Ct. May 7, 2008) (observing that the majority of Superior Court decisions hold "a simple breach of contract, even if intentional, does not amount to a violation of CUTPA in the absence of aggravating circumstances" and finding that allegations of fraudulent representations, fraudulent concealment, and false claims were aggravating circumstances that support a CUTPA violation). These are issues for the jury.

*Trade Links Cannot Recover for Breach of the Implied Covenant of Good Faith and Fair Dealing.*

BI-QEM states, without citation to authority or any meaningful analysis, that Trade Links has no claim for breach of the implied covenant of good faith and fair dealing. In making this statement, BI-QEM posits that because this claim arises out of the parties' 2018 arbitration, Trade Links' purported damages must be the allegedly favorable award Trade Links would have received had it not been deceived into withdrawing the arbitration[10]: Therefore, "only an arbitration panel has the jurisdiction to quantify these damages," leaving this Court without jurisdiction over the issue. This argument is meritless. Even assuming that the entirety of the breach of covenant claim stems from the events surrounding the 2018 arbitration, a premise not conceded by Trade Links or even apparent on the face of the operative complaint, BI-QEM's conduct during the arbitration is probative of Trade Link's assertion that BI-QEM was acting in bad faith in an effort to deprive Trade Links of benefits to which it was entitled under the SRA. Trade Links asserts that BI-QEM made knowingly false representations to Trade Links in an effort to end the arbitration; that those representations were relied upon by Trade Links to end the arbitration; and that because BI-QEM never intended to honor the SRA going forward, as was represented, it immediately reneged on

---

[10] It is not at all clear that Trade Links intends to quantify its damages on this count by reference to a hypothetical arbitral award.

11

the promises made. And most importantly for the purposes of this motion, Trade Links supports those assertions with evidence in the record. (*See* McHugh Decl., Ex. 31; Essagof Aff. ¶¶ 7–8, ECF No. 183.) If bad faith is proven and it is established that Trade Links was deprived of a benefit to which it was entitled under the SRA as a result, then Trade Links is entitled to the damages which flow from this conduct. And the Court does not herein define or limit what those damages might look like and leaves Trade Links to its proof.

*Tortious Interference with Business Expectancy.*

In moving for summary judgment on Count Four, BI-QEM argues principally that Trade Links cannot establish that it was tortious for BI-QEM to communicate with its own customers and further that Trade Links cannot establish that it suffered any actual loss as a result of the alleged interference. In response, Trade Links asserts summarily that "Defendants' numerous unfair trade practices, including the deliberate marginalization of Mr. Essagof and interference with his relationships with customers, constitutes deliberate and malicious interference." (Plf.'s Mem. 33, ECF No. 181.) Trade Links does not address the argument that it cannot establish any loss.

As to the first issue, BI-QEM argues, not unreasonably, a very narrow reading of the tortious interference claim and argues that the claim, as read, fails. Trade Links on the other hand asserts a much broader and expansive reading of the claim, incorporating all of the allegations of wrongdoing, not simply those aimed at the customer base. As a result, the parties are talking past each other and the Court cannot resolve this issue on this record. Trade Links will be required, however, to articulate with specificity the scope of this claim and the resulting damages in its pretrial submissions if the claim is to be presented to the jury.

*Connecticut Commission Act.*

BI-QEM argues that because it withdrew its May 31, 2018 termination letter before the effective termination date, the SRA was not terminated until March 2019, when Trade Links terminated the SRA. Therefore, BI-QEM argues, Trade Links cannot recover under the Connecticut Commission Act based upon BI-QEM's May 31, 2018 termination letter. *See* Conn. Gen. Stat. §§ 42-481 *et seq.* Again, BI-QEM's argument presupposes facts which are in dispute, *i.e.*, whether BI-QEM had breached the SRA by, for example, sending its May 31, 2018 termination letter and thereby causing the business relationship to end before March 2019. As discussed above, BI-QEM may have repudiated the SRA at some point prior to March 14, 2019. (*See* McHugh Decl., Exs. 7–16, 22, 31.) And if BI-QEM had repudiated the SRA prior to March 14, 2019, then Trade Links may be able to recover penalties available under Conn. Gen. Stat. § 42-482.

*Chapter 93A: Massachusetts Unfair Trade Practices Act.*

BI-QEM argues that Trade Links has failed to make out a Massachusetts Unfair Trade Practices Act claim because Trade Links has failed to allege that any tortious claims occurred in Massachusetts. *See* Mass. Gen. L. 93A § 11. BI-QEM fails to cite to any undisputed facts supporting this claim, and Trade Links cites to multiple bases to support a contrary conclusion—to include the fact that BI-QEM, Inc. has its principal place of business in Massachusetts and much of the conduct complained of occurred in Massachusetts.

BI-QEM also asserts that because its relationship with Trade Links was exclusive, Trade Links was not offering its services to the public, and the relationship between BI-QEM and Trade Links cannot, therefore, fall within the scope of Chapter 93A. (*See* Defs.' Mem 36.) The Massachusetts statute

13

> is designed to "encourage more equitable behavior in the marketplace[,]" and its protections apply not only to consumers but also "persons engaged in trade or commerce in business transactions with other persons also engaged in trade or commerce." *Manning v. Zuckerman*, 388 Mass. 8, 12, 444 N.E.2d 1262, 1264–65 (1983). However, the "trade or commerce" requirement has been interpreted to exclude purely private transactions, including "internal employment or intra-enterprise disputes." *Weiler v. PorfolioScope, Inc.*, 469 Mass. 75, 92–93, 12 N.E.3d 354, 369 (2014), and cases cited. Thus, 93A does not apply to someone seeking to sue his or her business partner, or a suit by an employee against his or her employer. *See, e.g.*, *Debnam v. FedEx Home Delivery*, 766 F.3d 93, 96–97 (1st Cir. 2014) (citing, *inter alia*, *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 23 & n.33, 679 N.E.2d 191 (1997)).
>
> There is case law support for the conclusion that ch. 93A does not apply where . . . the defendants have an exclusive arrangement with [Plaintiff]. Thus, ch. 93A was held not to apply to a situation whereby the plaintiff provided delivery services to just one customer, FedEx, and not to the general public: the result was the same regardless of whether the plaintiff was an employee or independent contractor of FedEx. *Debnam*, 766 F.3d at 97–98. In *Benoit v. Landry, Lyons & Whyte Co., Inc.*, 31 Mass. App. Ct. 948, 580 N.E.2d 1053 (1991) (rescript), the plaintiff was a licensed real estate salesman who was prohibited by statute "from operating his own real estate business and from receiving payment for his services from anyone except the single broker with whom he or she is affiliated." *Id.* at 949, 580 N.E.2d 1054. Despite the fact that the plaintiff was an independent contractor, 93A did not apply. *Id.*; *see also Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd.*, No. 14-cv-12047-ADB, 2015 WL 4467064, at *11 (D. Mass. July 20, 2015) (motion to dismiss ch. 93A claim brought by exclusive marketing agent denied where there was nothing in the parties' Exclusive Agency Agreement that prevented the plaintiff "from providing its services to anyone else").

*Allstate Ins. Co. v. Fougere,* 450 F. Supp. 3d 10, 17 (D. Mass. 2020) (other citations omitted).

In advancing this argument, BI-QEM relies on "Undisputed Fact No. 67," which states that "Plaintiff was devoting its services as a sales agent exclusively to Defendants and therefore was not offering its services to the public" while citing to paragraph 2 of the SRA. However, this argument is premised on a contested reading of the SRA, and, in any event, Trade Links has offered evidence that it provided services—for products that did not compete with BI-QEM's—to other companies during the time period at issue. (Plf.'s L.R. 56(a)(2) Statement at 19–20; *see also* McHugh Decl. Ex. 1 at 16 (noting that only 85% of Trade Links' commission-based income came

from BI-QEM); Essagof. Aff. ¶ 11 (discussing Trade Links' representation of other companies).).

Accordingly, the cases upon which BI-QEM relies are inapposite.

*Attorneys' Fees from Arbitration Proceedings Cannot be Recovered.*

BI-QEM argues that Trade Links is precluded from seeking attorneys' fees incurred in connection with the arbitration because Trade Links had previously sought such fees in the arbitration, and therefore this Court has no jurisdiction over such claims. BI-QEM also states, in a footnote, that Trade Links cannot recover attorneys' fees from the associated state court proceedings in which BI-QEM sought to stay the arbitration because the stipulation of dismissal in each of those cases provided that the parties would bear their own fees and costs.[11] Similar to the argument regarding the breach of the covenant of good faith and fair dealing, this argument is meritless. As discussed above, Trade Links' attorneys' fees incurred in connection with the arbitration may be an appropriate measure of damages as to some claims, *supra* at 11–12. And the Court does not, at this stage of the litigation, preclude the Plaintiff from seeking such damages or portions of such damages. However, Plaintiff will bear the burden of establishing the causal nexus between any such damages and the cause of action(s) asserted.

*Sua Sponte Motion to Strike Pursuant to Fed. R. Civ. P. 12(f)(1).*

Finally, the Court strikes, pursuant to Fed. R. Civ. P. 12(f)(1), paragraphs 214–16 of the Second Amended Complaint as redundant and immaterial. Though contained in Count Seven, an unjust enrichment claim, these paragraphs cite the Connecticut Commission Statute and are duplicative of paragraphs 202–04, which appear in Count Five, the claim brought pursuant to the Connecticut Commission Statute.

---

[11] Plaintiff's response to these arguments appears to misapprehend them. Plaintiff asserts that it will seek attorneys' fees pursuant to the terms of the SRA as well as under 93A §11, CUTPA, and the Connecticut Commissions Statute. It is unclear whether the attorneys' fees incurred in connection with the arbitration and with the actions to stay the arbitration are included in such claims or whether the attorneys' fees sought are those occasioned by this litigation.

**Conclusion**

For the foregoing reasons, BI-QEM's motion for summary judgment is DENIED in all respects. Further, the Court *sua sponte* strikes paragraphs 214–16 of the operative Second Amended Complaint. The parties shall appear at a telephonic status conference on October 14, 2021 for purposes of setting a trial date.

**SO ORDERED** at Bridgeport, Connecticut, this 28th day of September 2021.

    */s/ Kari A. Dooley*
    KARI A. DOOLEY
    UNITED STATES DISTRICT JUDGE